## THE KAGA MARU.

### THE ELBA.

(District Court, D. Washington, N. D. April 6, 1903.)

#### No. 2,127.

1. COLLISION—STEAM VESSELS CROSSING—NAVIGATING HARBOR IN FOG.

Two large ocean steamships, the Elba and the Kaga Maru, both held in fault for a collision in the harbor of Seattle in a fog while on crossing courses, for violation of article 18, rule 3, of the rules for harbor navigation (30 Stat. 96 [U. S. Comp. St. 1901, p. 2882]), which required each, on hearing the fog signals of the other, and not knowing her course, to signal such fact; the Kaga Maru also for violating article 16, in not stopping her engines on hearing the signals of the other vessel ahead in the fog, without knowing her position; and the Elba, having the other vessel on her starboard side, for not so navigating as to keep out of the way, as required by article 19.

In Admiralty. Cross-libels to recover damages resulting from a collision between two steamships, which occurred on a foggy afternoon in the harbor of Seattle. On final hearing. Findings and decree that the collision resulted from the mutual fault of both vessels, and that the damages should be divided equally.

Struve, Allen, Hughes & McMicken, for libelant.

Burke, Shepard & McGilvra and George F. Vanderveer, for cross-libelant.

HANFORD, District Judge. The vessels involved in this case are both large ocean-going steel steamships. The Elba was at the time a new ship, having a carrying capacity of upwards of 6,000 tons of freight, and was under charter to carry a cargo of wheat from Puget Sound ports to the Canary Islands. She had taken on board about 3,300 tons at Tacoma, and was coming into the Great Northern Dock, in that part of Seattle Harbor commonly known as "Smith's Cove," to complete loading. The Kaga Maru is also a new steamship, somewhat larger than the Elba, and is one of the Nippon Yusen Kaisha Line, regularly employed in carrying freight and passengers between Seattle and ports of Japan and China, and at the time of the collision was just starting on her outward voyage, having left the Great Northern Dock in Smith's Cove, and was on her proper course, heading about west southwest. The Elba arrived off Battery Point at about 2:30 p. m., local time, and then proceeded very slowly until within a few minutes of the time of the accident. According to the testimony of her pilot, the order to reduce speed was given at 2:28,

¶ 1. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

but according to the engineer's log that order was recorded at 2:38. It is probable that there is a discrepancy between the time in the engine room, which may have been ocean time, and the local time observed by the pilot.

The Kaga Maru commenced to maneuver to get away from her dock at 2:30 p. m., which was a few minutes after the Elba reduced speed off Battery Point. About 10 minutes were consumed in backing out and turning before the Kaga Maru was headed on her course west southwest, and she then moved ahead, her engines working full speed until she gained steerageway, and then reduced to half speed before coming in sight of the Elba, during which time she developed a speed approximating five knots per hour.

The primary cause of the collision was fog, which was too thick during the early part of the day for the vessels to proceed, and during the middle part of the day and afternoon it settled down so that overhead was clear; but fog hung low over the water in banks, which at intervals lifted so that it would be clear in places, which would be obscured again by the bunches of fog drifting and closing up. It was on account of the fog that both vessels proceeded slowly, giving fog signals by single blasts of their whistles at short intervals. The officers and crews of both vessels were at their stations, and both ships were in charge of experienced local pilots. I do not, however, consider the collision as an inevitable accident. On the contrary, it is my opinion that it would not have occurred if the rules prescribed by law for navigating and maneuvering steam vessels in fogs had not been violated in the management of both vessels. In order to do justice in placing the responsibility, it is important to locate the place of the collision, and I find this to be a difficult matter on account of the conflicting testimony bearing upon the question. The testimony on the part of the Elba fixes the place at about one mile west of the Great Northern Dock in Smith's Cove, and three-quarters of a mile offshore. On account of the fog, both vessels should have been steered by compass, and I blame the officers of the Elba for not producing a record of the courses which were steered after passing Battery Point. Her first officer was especially charged to observe the compass, and he appears to have had no other duty; and yet, according to his testimony, he did not write down the courses which were steered, and claimed that he could not remember them. When pressed upon cross-examination, he could not be made to tell what courses were steered, except in a general and uncertain manner, to the effect that they steered northerly, or north by east. The testimony of the pilot and the man at the wheel is equally vague and unsatisfactory, and the captain did not observe the compass. The pilot's testimony is to the effect that he tried to steer a north by east magnetic course, "but she was a new ship, and, like all new iron ships, their compasses are all more or less different." The testimony of all the witnesses who were on board the Elba with respect to the place of the collision is based entirely upon their observations of the land before and after the collision, and they did not see land after passing Battery Point before the collision, except trees which they could see above the fog on the high land ahead of them. If the course steered was unsteady and uncertain as the

testimony of the chief officer, and if the average rate of speed of the Elba from the time of passing Battery Point until she came to a dead stop was five knots per hour, she might have reached the place where the evidence in behalf of the Kaga Maru locates the collision, shown on the map annexed to this opinion:

At that place the timber on Magnolia Bluff would have been ahead, and only a few trees would have been seen ahead if she had been one mile nearer Smith's Cove. All of the witnesses on the Elba are also positive in testifying that the Kaga Maru was running at a high rate of speed when she first came in view, and it is safe to assume as a fact established by all the evidence in the case that the Kaga Maru was making at that time not less than four or five knots per hour. Going at an average rate of five knots for 20 minutes, she must have been further to the westward than the place which the witnesses for the Elba have indicated as the place of the collision; and if her course was west southwest, as appears by the uncontradicted testimony of her officers, she would have met the Elba about half a mile offshore opposite Magnolia Bluff, on which there is standing timber. The several witnesses who were on the Elba, and who observed timber on the high land ahead of the ship before the collision, all estimate the distance of the timber from the ship at about three-quarters of a mile;

and, if this estimate of distance is approximately accurate, the ship must have been at that time less than half a mile from the beach. When the timber was first observed, the pilot directed soundings to be made, to ascertain the depth of water, and the second officer was detailed to attend to that duty; and from their testimony it appears that three of the crew were also making soundings, or assisting the second officer in doing so, and yet, from their negligence in doing the work, or unwillingness to tell the facts, they have all failed to inform the court what depth of water was found. The captain's testimony is to the effect that 36 fathoms of sounding line was out without reaching bottom, but as he was on the bridge, some distance away from the sounding line, his testimony could not have been based upon actual knowledge or his own personal observation. The men who handled the sounding line are the witnesses whose testimony would be valuable if they could be induced to tell the facts. One of the seamen, named Carl Schwartz, testified that he was taking soundings, and that the depth of water at the place of the collision was 36 or 40 feet; but when pressed for a positive statement, he professed to be unable to remember whether it was 36 or 40 feet, or that number of fathoms. According to the second officer's testimony, he was ordered by the captain to get ready to take soundings, and he had "the line down, and the lead made ready"; but, if he actually made a cast of the lead, he failed to give evidence of that fact. The pilot of the Elba, to an inquiry as to the bearing of Magnolia Bluff from the spot where the collision took place, answered:

"We were somewhere to the westward of Smith's Cove. I wish that that lump-headed second mate had thrown the lead. We would know our position exactly. But he stopped when he saw her coming, and he was scared to death."

It is my opinion that there is not only a clear preponderance of the evidence supporting the claim of the cross-libelant with respect to the place of the collision, but it is also impossible to locate the place differently if due consideration is given to the circumstances disclosed by the evidence in behalf of the libelant. I therefore conclude as a fact that the place of the collision was proximately two miles west of the Great Northern Dock in Smith's Cove, and half a mile offshore, and that the Elba was at the time of the collision headed towards the shore, and the Kaga Maru was on her course west southwest.

A few minutes before the collision the engines of the Elba were stopped and reversed to check her headway, and her captain intended to drop her anchor as soon as the soundings showed a proper depth of water. By this means she lost steerageway, and was not under command of her helm. Three blasts of her whistle were given as a signal that she was going astern, and a moment latter the Kaga Maru became visible through the fog, off her starboard bow, and heading towards her stem. On the instant of discovering the Kaga Maru, the captain of the Elba pulled the whistle three times, repeating the signal indicating that she was going astern, but no movement was given to the helm, and nothing else was done on board the Elba to avoid the collision. The vessels came together at 3 o'clock, or 3:01, local time; the Kaga Maru striking the stem of the Elba with such force as to

twist the stem to port and tear away several plates on the port bow, doing considerable damage to the hull above the water line. The point of contact on the Kaga Maru was on her port bow, approximately 30 feet abaft of her stem, and she also sustained considerable damage above the water line. At the time of the collision the engines of the Elba had been working astern about three minutes, and she had commenced to make sternway in the water; and the engines of the Kaga Maru had been working astern one minute, or one minute and a half, but she did not come to a stop until after striking and crowding clear past the Elba.

The officers of the Kaga Maru did not expect to meet a large vessel lying across her path and heading towards the shore. They must have heard the fog signals, which were sounded frequently on board the Elba; but they assumed that the signals came from a vessel entering the harbor from the north or west, and which had already crossed the course of the Kaga Maru, and that it was safe to proceed at half speed. The Elba did not become visible to them through the fog until after their ship had been discovered by the officers of the Elba. As soon as possible after discovering the Elba, the Kaga Maru ported her helm and reversed her engines; but, being a large ship, her speed was scarcely checked, and her course was changed but little, before she struck the stem of the Elba. Her officers must be held responsible for going ahead recklessly, knowing that there was a large vessel under way ahead, which they could not see, for they had no right to assume anything with respect to the place in the harbor to which the other vessel was heading, and they should have made allowance for possible negligence or stupidity in the management of a vessel whose movements were indicated to them only by warning signals. In this connection I am bound to give consideration to the fact that the steam tug Doctor, which had been previously engaged to assist the Elba in getting to the Great Northern Dock, had been lying waiting for her approach until about the time that the Kaga Maru backed out from the dock, and then, hearing the Elba's fog signals, the tug ran past the Kaga Maru, and, being guided only by her whistle, found the Elba, and was alongside of her when the two large ships collided. The Elba's whistle indicated to the tug that she was coming to the Great Northern Dock, and the same sounds should have instructed the officers on the deck of the Kaga Maru that the incoming vessel might be heading for the dock which they had just left, and that great caution on their part was required.

On the other hand, the officers of the Elba did not know her position or the point in the harbor to which she had proceeded, and, as appears by their own admissions, they heard fog signals of moving vessels all around them, and they must have heard the signals which were sounded by the Kaga Maru as she approached. Therefore it was an inexcusable fault on their part to lay their ship across the path of the Kaga Maru, when she was known to be coming towards them, and prepare to anchor, without giving a more distinct warning of danger than the mere sounding of their whistle by single blasts, and by giving the signal that she was going astern, which would not

indicate her course to those who could not see her. When she lost steerageway, she should have rung a bell or sounded not less than four blasts of her steam whistle as a danger signal. The captain of the Elba, in his testimony, claimed that, if he had been master of the Kaga Maru, the collision would not have occurred, for he would have avoided it by porting the helm and turning the ship to starboard; and he claimed that, in his position as captain of the Elba, he could do nothing to avoid the collision, except to work his engines astern at full speed. He claims that he could do nothing else because his ship did not have steerageway. But his excuse cannot be allowed, nor can the blame for the accident be cast entirely upon the Kaga Maru for her failure to change her course in time to have avoided the collision. I deny the claims of the Elba's captain for the reason that it was his duty to maneuver the Elba so as to avoid the collision. She was not anchored or disabled. Therefore she must be held to the responsibility of a steam vessel under way.

The law applicable to this case is to be found in the act of Congress approved June 7, 1897 (30 Stat. 96; U. S. Comp. St. 1901, p. 2875). The preliminary paragraph of the statute prescribes that:

"A vessel is 'under way' within the meaning of these rules when she is not at anchor, or made fast to the shore or aground. * * *

"Art. 15. A vessel when at anchor shall, at intervals of not more than one minute, ring the bell rapidly for about five seconds. * * *

"Art. 16. Every vessel shall, in a fog, mist, falling snow or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel, hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over. * * *

"Art. 18, rule 3. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle.

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other. * * *

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."

The international rules to prevent collisions at sea are the same, except that they contain an additional rule that:

"A steam vessel under way, but stopped, and having no way upon her, shall sound at intervals of not more than two minutes two prolonged blasts, with an interval of about one second between."

It is my opinion that both vessels violated rule 3, quoted above; that the Kaga Maru violated article 16, by proceeding at such a rate of speed when she did not know the position or course of the other vessel that she could not stop in time to avoid the collision; and it is my opinion that the Elba violated article 19, by not keeping out of the way of the Kaga Maru.

If the parties fail to agree as to the amount of damages, the case will be referred to a commissioner to ascertain and report the amount of damages sustained by each vessel, including damage by delay.